AO (Rev. 5/85) Criminal Complaint         KJMP/mr

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
| vs. | |
| KIMBERLY LIVELY | CASE NUMBER: 8:13-MJ-1478-T-EAJ |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From a date unknown, but at least beginning in early 2012, through and including the Spring of 2013, in Pinellas and Polk Counties, in the Middle District of Florida, and elsewhere, the defendant did,

> Conspire with others, known and unknown, to possess with the intent to distribute of 50 grams or more of methamphetamine actual, a Schedule II Controlled Substance, and did possess firearms during and in relation to a drug trafficking offense,

In violation of Title 21, United States Code, Section(s) 846 and 841(b)(1)(A).

I further state that I am a Special Agent with Drug Enforcement Administration, and that this Complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

_____
Signature of Complainant
Special Agent Michael Pullen
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

July 22, 2013      at      Tampa, Florida

ELIZABETH A. JENKINS
United States Magistrate Judge
Name & Title of Judicial Officer      Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Michael Pullen, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), currently assigned to the Tampa District Office. I have been a law enforcement officer for over five years. During this time I have participated in criminal investigations involving local, national and international drug trafficking organizations. I have worked with other federal, state, and local agencies in conducting these investigations. In connection with my official DEA duties, I investigate criminal violations of federal laws, including but not limited to, Title 21, United States Code, Sections 841(a)(1), 843(b) and 846 (drug trafficking offenses). During my tenure with the DEA I have participated in hundreds of investigations of drug trafficking offenses involving methamphetamine and, among other things, have conducted or participated in surveillance, wire interceptions, the execution of search warrants, debriefings of informants and reviews of taped conversations. As a Special Agent, I have received specialized training in the investigation of narcotics related crimes and have participated in the investigation of complex drug conspiracies and all stages of illegal narcotics distribution, including hundreds of investigations relating to the distribution and the sale of controlled substances such as methamphetamine. As such, I am familiar with the methods, routines and practices of narcotics traffickers, as well as the appearance and characteristics of controlled substances and the methods in which they are used, packaged for sale and distributed.

2. This affidavit is being submitted in support of a Criminal Complaint charging Kimberly LIVELY (AKA "Kim" LIVELY) with conspiracy to possess with the intent to distribute methamphetamine, a Schedule II controlled substance, the amount of the methamphetamine being 50 grams or more, in violation of Title 21, United States Code, Section 841(a)(1), 841(b)(1)(A). This affidavit does not contain all of the information pertaining to this investigation, and merely provides probable cause for a Court finding. I have personally participated in this investigation described below and am familiar with the information contained in this affidavit either through personal observations or those of other law enforcement officers and credible confidential sources.

3. Agents and officers first became aware of the drug trafficking activity of Kimberly LIVELY in January of 2012 when a source of information (SOI) identified LIVELY as a source of supply for methamphetamine in Clearwater, FL. The SOI stated he/she was aware that LIVELY was actively distributing 1/8 ounce quantities of methamphetamine but could not currently purchase methamphetamine from LIVELY.

4. In July of 2012, a confidential source (CS1) informed SA Pullen that he/she had personally bought 1/8 ounce quantities of methamphetamine from LIVELY on numerous occasions. At the time, CS1 was no longer actively purchasing methamphetamine from LIVELY and could not provide any current information regarding her drug trafficking activity.

5. In August of 2012, CS1 telephonically introduced St. Petersburg Police Department Detective Joe Pittaluga (acting in an undercover capacity), to a cooperating defendant (CD1). CD1 had previously been identified as a multi-ounce methamphetamine source of supply out of Polk County, FL. On August 7, 2012, CD1 agreed to sell Det. Pittaluga one ounce of methamphetamine for $1,800.00. CD1 initially refused to meet with Detective Pittaluga directly. Instead, according to CS1, CD1 wanted CS1 present for the drug transaction or wanted to arrange for Detective Pittaluga to pay LIVELY at a later time after CD1 provided the methamphetamine to Detective Pittaluga. It was eventually agreed that CD1 would meet Detective Pittaluga in Tampa, FL to conduct the one ounce methamphetamine transaction. Prior to meeting Detective Pittaluga, CD1 met with CS1 at CS1's job in Tampa, FL. CS1 relayed to agents and officers that CD1 had shown CS1 three ounces of methamphetamine and had informed CS1 he (CD1) was going to go meet Detective Pittaluga to conduct the drug transaction. Immediately after leaving the meeting with CS1, CD1 and his/her companion, cooperating defendant 2 (CD2), met with Detective Pittaluga and sold him one ounce of methamphetamine. Following their arrests months later, both CD1 and CD2 informed SA Pullen that they had traveled to LIVELY's residence immediately following the drug transaction with Detective Pittaluga and had sold LIVELY the remaining two ounces of methamphetamine that CS1 had seen. The one ounce of methamphetamine CD1 had sold to Detective Pittaluga was sent to the Southeast Research Lab where an analysis was conducted. The results showed the ounce of methamphetamine sold to Detective Pittaluga was 52.1% pure with 14.6 grams of actual methamphetamine and a net weight of 28.1 grams.

6. In October of 2012, following his/her arrest, CD2 informed SA Pullen he/she and CD1 had sold methamphetamine to LIVELY on numerous occasions in ½ ounce and one ounce quantities. CD2 informed agents and officers that LIVELY was a methamphetamine distributor to numerous customers in the Clearwater, FL area. CD2 informed SA Pullen he/she had been present in LIVELY's apartment on numerous occasions when LIVELY would sell methamphetamine to customers. CD2 stated LIVELY was very conscious of law enforcement tactics and would insist that individuals she sold methamphetamine to use it at her apartment before leaving.

7. In November of 2012, following his/her arrest, cooperating defendant 3 (CD3) informed SA Pullen that he/she had first been introduced to LIVELY months earlier by CD1 and CD2. CD3 stated he/she was a methamphetamine source of supply for CD1 and CD2 at the time and that LIVELY was a customer of CD1 and CD2. CD3 stated LIVELY began coming with CD1 to CD3's residence on numerous occasions to purchase ounce quantities of methamphetamine. CD3 stated he/she CD3 stated he/she was unsure how much of this was actually going to LIVELY when she would come with CD1 because they didn't split it up in front of CD3. However, CD3 stated LIVELY later began coming by herself (without CD1) to CD3's residence to purchase methamphetamine. CD3 stated he/she had sold LIVELY ½ ounce of methamphetamine on two occasions at his/her residence for $700.00 per ½ ounce. CD3 also stated he/she had sold LIVELY ¼ ounce of methamphetamine on two occasions at his/her residence for $400.00 per ¼ ounce. CD3 also stated he began

meeting LIVELY at other locations (away from his/her residence) for the purpose of selling her methamphetamine. CD3 stated he sold LIVELY one ounce quantities of methamphetamine away from his/her residence on approximately 15 to 20 occasions.

8. CD1 and CD2 also corroborated they had brought LIVELY to CD3's residence on numerous occasions. CD1 stated the first time he/she had brought LIVELY to CD3's residence to purchase methamphetamine, two of the ounces of methamphetamine they had bought together went to LIVELY. CD1 stated LIVELY accompanied him/her on approximately 10 more occasions over time and had purchased anywhere between two ounces to 3.5 ounces of methamphetamine on each occasion.

9. On March 5, 2013, SA Pullen approached Kim LIVELY. After having been advised of her Miranda rights, LIVELY admitted to purchasing ounces of methamphetamine from CD1, CD2 and CD3 on numerous occasions, corroborating what CD1, CD2, and CD3 previously had claimed. Although at the time LIVELY had agreed to cooperate with law enforcement, she since has made her self unavailable.

10. Based upon the information contained in this affidavit, there is probable cause to believe that Kimberly LIVELY, knowingly, willfully and intentionally conspired to possess with intent to distribute methamphetamine, a Schedule II controlled substance, the amount of the methamphetamine being 50 grams or more, in violation of Title 21, United States Code, Section 841(a)(1), 841(b)(1)(A).

FURTHER AFFIANT SAYETH NAUGHT.

_____
Special Agent Michael Pullen
Drug Enforcement Administration

Subscribed and sworn to before me this
22nd day of July, 2013.

_____
ELIZABETH A. JENKINS
United States Magistrate Judge